[Cite as *State v. Hamrick*, 2023-Ohio-117.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-06-028 |
| | : | O P I N I O N |
| - vs - | | 1/17/2023 |
| | : | |
| ANGELINA V. HAMRICK, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2019 CR 00675

Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas Horton, Assistant Prosecuting Attorney, for appellee.

Law Office of Angela Glaser, and Angela Glaser, for appellant.

**BYRNE, J.**

{¶1}   The Clermont County Court of Common Pleas convicted Angelina Hamrick of aggravated murder with an accompanying firearm specification and sentenced her to a prison term.  Angelina appealed both the guilty verdict and sentence.  For the reasons outlined below, we affirm.

## I. Factual and Procedural Background

{¶2} The trial in this case lasted 13 days and involved testimony by more than 30 witnesses. Rather than individually summarize the testimony of so many witnesses, in this section we summarize the key information gleaned from the testimony of the witnesses at trial. We note specific testimony by individual witnesses where appropriate.

### A. The Hamricks' Marriage and Angelina's Affair

{¶3} In 2008, Jason Hamrick was stationed in South Korea as an airman in the United States Air Force. There he met Angelina, who was a Russian citizen. The two began a romantic relationship. Jason was eventually transferred to North Carolina, while Angelina returned to Russia. The two maintained their romantic relationship and had their first child, S.H. As a result, Angelina moved from Russia to the United States to live with Jason. The couple married in 2011 and had two more children, B.H. and D.H. In 2015, the family moved to Ohio and eventually bought a home at 2540 Wings Corner Point Isabel Road in Bethel, Clermont County, Ohio.

{¶4} In Ohio, Jason worked for the Air Force as a recruiter. He met another Air Force recruiter, Michael Clark. The two developed a friendly work relationship. Clark met Angelina at a work function and the two became acquaintances. In October 2017, Clark and Angelina began a secret sexual affair. From then on, they communicated regularly with each other, even after Clark was transferred to Dyess Air Force Base in Texas.

{¶5} In January 2018, Jason, Angelina, Clark, and Clark's then-wife went on a cruise together. Jason ended up leaving the cruise early after fighting with Angelina. The relationship between Jason and Angelina continued to worsen over time. They eventually separated and engaged in a contentious custody dispute. Angelina left their shared residence, but Jason struggled to afford childcare for their three children. He eventually agreed to allow Angelina to move back home to take care of the children.

{¶6} In discussions with Clark, Angelina would routinely talk about murdering Jason. They discussed shooting, stabbing, or poisoning Jason. Clark testified that Angelina mostly talked about shooting Jason in their home. They also discussed their plan to clean up the mess and get rid of the evidence in the Ohio River. Angelina knew that Jason had a 9 mm firearm that he kept in the home and found the location of the key to unlock the case where Jason stored it. In June 2019, Angelina removed the firearm from the case and fired a round outside the window of S.H.'s room. The shot startled S.H. Angelina took a photograph of the shell casing and sent it to Clark. Angelina told Clark that she fired the weapon to see if any law enforcement would show up.

**B. Events of Friday, June 28, 2019**

{¶7} On Friday, June 28, 2019, Angelina stopped at the Meijer in Eastgate with her children to buy, among other things, Clorox Bleach and lemon scented disinfectant wipes. Around that same time, Jason bought a sandwich from a Subway Restaurant in Sharonville. At around 3:00 p.m., Jason called a man to ask about a Snap-on truck that he was interested in purchasing as part of his retirement plan. Just before 5:30 p.m., Jason made a purchase from Phantom Fireworks.

{¶8} At about 6:00 p.m. Angelina arrived at a winery near the Hamrick residence. The owners of the winery, Patricia Hornak and William Skvarla, recalled that the winery was particularly busy that night. Angelina pulled up a stool to the tasting bar and began conversing with Hornak and another employee. Angelina discussed her separation from Jason and how she had recently returned to their home to help with the children. She showed Hornak and Skvarla pictures of court documents related to the child custody issues she was having with Jason. She also talked about her boyfriend and showed Hornak a photograph of him. Angelina told Hornak that the court system was leaving her with few options and that she either had to take the children and flee to Moscow or kill Jason. She

- 3 -

repeated this suggestion several times that night. Hornak tried to console Angelina and cautioned her against murdering anyone. After drinking around two glasses of sangria, Angelina left the winery to return home at about 8:00 p.m.

{¶9} Once home, Angelina joined her sons by a bonfire while Jason remained inside. At some point, Angelina went inside. At 9:03 p.m., according to Clark, Angelina called Clark to tell him "I did it." When Clark asked what she had done, she simply repeated "I did it." Based on their previous conversations, Clark understood that Angelina was telling him that she had killed Jason. In two later calls, Angelina explained that there was a mess on the couch and asked Clark to come help even though he was in Texas. She also asked Clark for recommendations on what to do; Clark offered little in response but agreed that she should get rid of the body.

{¶10} Meanwhile, B.H. had gotten thirsty while sitting by the bonfire and approached the sliding glass door at the back of the house. When he got to the door, he found that it was locked. B.H. looked through the glass and observed his father laying on the couch with a pillow on his head. B.H. thought this was strange because his father never slept on the couch. When Angelina saw B.H. at the door, she told him that she would get a glass of water for him. Angelina later brought out a glass of water while she was on the phone with Clark. When Clark pressed her for more details, Angelina responded that the children were in front of her, and she was going to take them out for pizza. Angelina spent a little more time with the children by the bonfire and then loaded them into the car.

{¶11} Angelina and the children arrived at Little Caesar's around 10:00 p.m. After picking up the pizza, Angelina drove to the Meijer in Eastgate and filled her gas tank. Angelina and the children then returned home to eat. S.H. and B.H. both stated that they did not see their father when they returned but noted that his car was still there. After eating, Angelina sent the children to bed.

**C. Phone movement on Saturday, June 29, 2019**

{¶12} At 3:53 a.m. on Saturday, June 29, 2019, cellular data records introduced at trial show that Jason's cell phone began moving away from the Hamrick residence. The phone began moving west along State Route 125 until it reached I-275, when it then began travelling south/southwest. The phone continued to ping cellular towers until it stopped in Bellevue, Kentucky just before 4:30 a.m. At that point, the phone stopped attempting to ping cellular towers. During this time, Angelina's cell phone remained at the Hamrick residence, but showed no evidence of activity aside from one incoming email.

**D. Events of Sunday, June 30, 2019**

{¶13} On Sunday, June 30, 2019, Jason was supposed to visit his parents at their home in Indiana with the children. That morning, S.H. went downstairs to find his father but could not locate him. S.H. found Angelina outside cleaning her car and asked her if she had seen him. Angelina responded that he had gone off drunk. However, S.H. observed that his father's car remained parked in the garage. S.H. then decided to ask his grandparents if they had seen his father.

{¶14} Amy Oliver, Jason's mother, received S.H.'s call at about 11:15 a.m. When S.H. asked if she had seen his father, Amy told him that she had not and wondered why they were not on their way to Indiana. S.H. explained that he had not seen him since Friday.

{¶15} Realizing that something was wrong, Amy told S.H. that she would call him back. Amy then had her husband, Jon Oliver, call the police. While Jon was on the phone with the Clermont County Sheriff's Office, Amy called the children's guardian ad litem, who instructed her to drive to Bethel and get the children. Amy and Jon also contacted the military about Jason's disappearance. Amy and Jon then went to pick up the children to take them back to their home in Indiana where they have remained throughout the pendency of this case.

{¶16} After a missing person report was filed, Deputy Yvonne Sheppard responded to the Hamrick residence. While Deputy Sheppard spoke with Angelina, Corporal Cooper and Deputy Bailey arrived and began to take photographs of the interior and exterior of the home.

{¶17} As the deputies walked through the Hamrick residence, they made several observations. They noticed that while the first floor of the home was clean, the upstairs was in various states of disarray. There were various cleaning agents and cleaning devices scattered around the first floor and they observed that the carpet appeared to have been recently vacuumed. Deputy Sheppard also noticed that if Jason had indeed left the home, he had not taken his wallet. Additionally, Deputy Sheppard learned that Jason's phone had last pinged near the Ohio River, but that none of his vehicles were missing. Deputy Sheppard received a report that Jason owned a firearm; while the deputies managed to locate the case, they were unable to find the firearm. Deputy Bailey found red spots resembling blood on the stairway leading to the basement and on the basement floor, yet Angelina denied knowing about any recent injuries that could have caused it.

### E. Discovery of Jason's Body

{¶18} Around 8:00 pm on Sunday, June 30, 2019, Virgil Bicknell and Tonya Bicknell were returning home from dinner. Their home was located on Swings Corner Point Isabel Road, about a half mile from the Hamrick residence. When they pulled into the driveway of their home, Tonya was looking at some of the overgrowth on the side of the driveway when she noticed a body in the adjacent ditch. The body was covered in dried grass clippings.

{¶19} Virgil called 9-1-1. Multiple officers and emergency personnel arrived on scene and began marking off a perimeter. Deputy Timothy Goins was sent to the Hamrick residence at 8:45 p.m. to follow up on the missing person report and to remain with Angelina until Sergeant Bernard Boerger arrived. Deputy Goins spoke with Angelina and began

asking her missing person questions. Angelina asked Deputy Goins if he thought she killed her husband and put him in her van. Deputy Goins had mentioned nothing about Jason's murder, a van, or even that a body had been found down the street.

{¶20} When he arrived, Sergeant Boerger spoke with Angelina while Detective Christopher Allen began a consensual search around the property. Among other observations, Detective Allen noticed that the yard had a large amount of grass clippings.

{¶21} Detective Allen returned to where Angelina was speaking with Sergeant Boerger, who was still explaining that a body had been found down by the road that could be Jason. Sergeant Boerger asked Angelina if she would come with him to the sheriff's office for an interview. She agreed. During the interview, Angelina showed little emotion in response to the suggestion that Jason had been murdered. She even declined to look at a photograph of the body, citing her aversion to blood. She said this before she was told how Jason had been killed. Angelina was permitted to leave the sheriff's office following her interview.

{¶22} On Swings Corner Point Isabela Road, Detective Mike Robinson and Gregg Shelley, a crime scene investigator, began processing the crime scene around Jason's body. Detective Robinson and Shelley photographed the scene and documented their findings, which included the foreign grass clippings, fingerprints, tire treads, shoe prints, and the body. Jason's body was in a state of decomposition and there was insect activity, particularly around the crown of his head where he had been shot.

{¶23} After processing the scene, Jason's body was placed inside a body bag. In doing so, Shelley documented abrasions to Jason's buttocks and back. The clothing that Jason was wearing had been completely worn away in some places and it was therefore evident that the body had been dragged for some distance. Investigators confirmed Jason's identity and his body was sent to the Hamilton County Coroner's Office for an autopsy.

**F. Autopsy of Jason's Body**

{¶24} Dr. Dorothy Dean, a deputy coroner, conducted an autopsy on Jason's body on Monday, July 1, 2019. She observed that the body was mildly-to-moderately decomposed. Based on the state of decomposition, the relaxing of rigor mortis, and the insect activity, she opined that Jason had died about 48 hours before he was discovered.

{¶25} Dr. Dean also noticed "excoriations" on the body, which she described as abrasions that occur after someone is already dead. She noted the excoriations on Jason's shoulder blade, buttocks, and heels. Describing these conditions as "postmortem artifacts," Dr. Dean opined that they were consistent with Jason's body having been dragged along a hard surface, such as a road.

{¶26} Finally, Dr. Dean testified that Jason died as a result of a gunshot wound to the head. Based on the injuries, she concluded that the weapon would have been fired directly against Jason's skull and that Jason died before he drew another breath. Dr. Dean located and removed the bullet that had lodged itself in Jason's jaw.

**G. First Search of the Hamrick Residence**

{¶27} Following the issuance of a search warrant, the sheriff's office began its search of the interior and exterior of the Hamrick residence. Outside the house, law enforcement found dried grass clippings consistent with those found on Jason's body, a pool tarp that had a large irregular section cut out, and a bottle of Clorox bleach. Inside the residence, they located a carpet shampoo unit, suspected bloodstains on the basement stairs, and a firearm case without a firearm.

{¶28} Believing that Jason's body had been dragged, Detective Robinson began searching the road between the Hamrick residence and the location where his body was found. Over a three-day period, Detective Robinson, Detective Dominic Donovan, and Detective Sean Schubert located numerous pieces of evidence along the road. The

detectives found pieces of tarp that were consistent with a hastily cut tarp found at the Hamrick residence. The detectives also found pieces of denim, including belt loops, consistent with the jeans Jason was wearing. At trial the state introduced Exhibit 9, which was an aerial representation of where these items were located in relation to the Hamrick residence and the location of Jason's body.

## H. Comments by Angelina

{¶29} On Monday, July 1, 2019, the day after Jason's body was discovered and after Angelina's interview at the sheriff's office, Angelina stopped by the winery to ask the owners if she could use their phone and computer because her devices had been seized as part of the investigation. Hornak agreed and Angelina then spent a portion of the day with the couple. Hornak also provided Angelina with transportation to the sheriff's office to recover her phone when it was released. When Angelina and Hornak returned to the Hamrick residence, they saw canine units searching around the barn. Despite claiming to know nothing about Jason's murder, Angelina commented to Hornak that they could look in the barn all they wanted, but they were not going to find anything.

{¶30} A little while later, a dive team approached Hornak and her husband and asked for permission to search the lake on their property. Hornak consented to the search. Angelina told Hornak that she did not throw anything into the lake and that she would not do that to them.

{¶31} Soon after, the Hamrick residence was turned back over to Angelina.

## I. Angelina's Boyfriend

{¶32} During her first interview with Sergeant Boerger, Angelina admitted to having a boyfriend, Clark. Therefore, Sergeant Boerger attempted to locate where Clark was presently and where Clark was on June 28, 2019, in case he was involved in the murder. Eventually, Sergeant Boerger confirmed that Clark was at Dyess Air Force Base in Texas

on the date of Jason's death.

{¶33} Sergeant Boerger contacted Clark on July 1, 2019, while Clark was in Texas. During this interview, Clark admitted to Sergeant Boerger that Angelina had talked to him about plans to kill her husband. However, Clark did not tell Sergeant Boerger about the June 28 call when Angelina told him that she had done it. Sergeant Boerger also spoke with Clark about cooperating with law enforcement and recording conversations between he and Angelina.

{¶34} Clark subsequently agreed to travel to Ohio to help law enforcement obtain an inculpatory statement from Angelina. On July 3, 2019, Sergeant Boerger flew to Texas to meet with Clark and to escort him back to Ohio. They discussed conducting a sting operation in the hopes of eliciting incriminating information from Angelina. Clark flew back to Cincinnati with Sergeant Boerger and met Angelina in a monitored hotel room. However, the sting operation failed.

{¶35} After the sting operation failed, Sergeant Boerger interviewed Clark again on July 5, 2019. During this second interview, Clark for the first time revealed that Angelina had called him on June 28, 2019, and told him that she had done "it" and that the couch was "a mess."

### J. Angelina's Second Interview

{¶36} That same day, Angelina came in for another interview, unannounced, this time speaking with Detective Robinson. During the interview, Angelina did not admit to any involvement in the murder. When questioned about prior discussions she had with Clark about killing Jason, Angelina laughed and later claimed that she was playing a "detective" game.

### K. Second Search of Hamrick Residence

{¶37} With the new information the sheriff's office had obtained, Angelina and Clark were arrested and charged.[1] Law enforcement then obtained a second search warrant for the Hamrick residence. In executing the second warrant, investigators focused on the living room and the basement, in particular the couch that Clark reported had been covered in blood. Two crime scene investigators with the Air Force processed the basement while Shelley and Detective Robinson processed the living room. In the basement, investigators found numerous droplets of blood leading from the stairs to the washing machine.

{¶38} The investigators also found a blanket in the basement that reacted to Bluestar, an investigative tool used to identify areas where blood has been cleaned up. Remaining blood droplets were collected and sent for analysis by the Bureau of Criminal Investigations. Of those sent with a sufficient sample, the blood droplets came back with Jason being a major contributor. Another bloodstain on the washing machine came back as Jason and Angelina being contributors.

{¶39} Meanwhile, in the living room, investigators noticed a large amount of white powder on the carpet in front of the couch, which turned out to be baking soda. Shelley and Detective Robinson then used Bluestar to determine whether blood had been cleaned up. Application of Bluestar revealed that a large amount of blood had been on the couch, under the couch, and in front of the couch.

{¶40} In addition, investigators found drops of blood both on the deck and below the deck. The specimens they collected showed that Jason was the major contributor. Turning to Jason's van, the investigators found blood on the back of the van, the trunk release, the driver's side door, the gas release, and the steering wheel. Again, Jason was found to be the major contributor. In the silver Ford vehicle found in the garage, investigators found

---

1. Clark ultimately pleaded guilty to obstructing justice. *State v. Clark*, 12th Dist. Clermont No. CA2021-06-030, 2022-Ohio-46, ¶ 4.

- 11 -

one of Angelina's passports and passport photographs for two of her sons.

**L. Trial, Conviction, and Sentence**

{¶41} A Clermont County grand jury indicted Angelina on one count of aggravated murder with an accompanying firearm specification. The matter proceeded to a 13-day jury trial beginning on April 12, 2021. The state presented more than 30 witnesses and introduced voluminous items of evidence and exhibits concerning the facts detailed above. Below we will address the testimony of the witnesses and the contested exhibits as relevant to Angelina's assignments of error.

{¶42} Following trial, the jury found Angelina guilty of aggravated murder with the accompanying firearm specification. The trial court then sentenced Angelina to a prison term of 33 years to life. Angelina appealed her conviction and sentence, raising four assignments of error.

**II. Law and Analysis**

**A. Gruesome Photographs**

{¶43} Angelina's Assignment of Error No. 1 states:

{¶44} THE TRIAL COURT ERRED WHEN IT ADMITTED DUPLICATIVE, GRUESOME PHOTOGRAPHS OF THE DECEASED.

{¶45} In her first assignment of error, Angelina contends that the trial court erred in admitting unfairly prejudicial photographs into evidence. She argues that gruesome photographs of Jason's body were not offered to prove any element of the offense and the state displayed the gruesome photographs to garner sympathy for Jason and to inflame the jury.

**1. Applicable Law**

{¶46} The admission or exclusion of evidence is a matter committed to the sound discretion of the trial court. *State v. Meredith*, 12th Dist. Warren No. CA2004-06-062, 2005-

- 12 -

Ohio-062, 2005-Ohio-062, ¶ 7.  Absent an abuse of discretion, this court will not reverse the trial court's decision to admit or exclude relevant evidence.  *Id.*

{**¶47**}  "The mere fact that a photograph may be gruesome or horrendous is not sufficient to render it per se inadmissible."  *State v. Benge*, 12th Dist. Butler No. CA93-06-116, 1994 Ohio App. LEXIS 5419, at *39 (Dec. 5, 1994), citing *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984).  This is true even if the defendant stipulated to the cause of death. *Id.*  A trial court may admit gruesome photographs if they provide the jury with an appreciation of the nature and circumstances of the crimes.  *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 26.  In other words, consistent with Evid. R. 403, "[g]ruesome photographs are admissible at trial as long as their probative value is not substantially outweighed by the danger that the accused will be unfairly prejudiced."  *State v. Houston*, 1st Dist. Hamilton No. C-190598, 2020-Ohio-5421, ¶ 43.

### 2. Angelina's Efforts to Exclude Gruesome Photographs

{**¶48**}  Before trial, Angelina filed a liminal motion requesting that the trial court "conduct a pre-trial hearing to preview the State's photographs of the deceased and issue an order *in limine* limiting if not preventing the State from admitting any gruesome photographs in evidence."  Angelina's liminal motion did not identify any specific photographs to which Angelina objected.

{**¶49**}  As requested by Angelina, the trial court held a hearing to discuss the admissibility of photographs of Jason's body.  At the hearing, Angelina narrowed her objections, which she described as falling into two groups: photographs taken at the scene where Jason's body was discovered, and photographs taken during the autopsy of Jason's body.  The state and the trial court interpreted Angelina's trial counsel's objections as applying to four specific photographs and an additional category of photographs.

{**¶50**}  First, Angelina's trial counsel stated at the hearing on the motion, "From the

crime scene photographs, we object to the admission of the two close-up photographs of the victim's bruised and bloodied face, one with a significant number of [larvae.]" This appears to be a reference to State's Exhibits 6U and 6V. Those two photographs were taken at the scene where Jason's body was found. Both photographs show Jason's face close-up, though one is even more zoomed in on Jason's face than the other. In both photographs, skin discoloration and extensive bruising are clearly visible, and grass clippings partially cover Jason's face. Exhibit 6V also shows larvae activity.

{¶51} In its decision/entry granting in part and denying in part Angelina's motion in limine with respect to the gruesome photographs, the trial court found Exhibits 6U and 6V to be admissible under Evid.R. 403. The trial court reasoned that the two photographs were relevant to the state's theory as to how Jason's killer disposed of the body and were relevant to Jason's time of death, concluding that they were "probative of the manner and circumstances of the deceased's death." The trial court found that the two photographs were distinct and focused on "various details of the deceased or the crime scene environment."

{¶52} Second, Angelina's trial counsel stated at the hearing on the motion, "And from the autopsy photographs, [we object to the admission of] the photograph of the victim's back and neck, that was also covered in [larvae], a close-up of the victim's face, consisting of significant bruising and discoloration, and then also any photographs of the victim's reflected scalp." Trial counsel's reference to "the photograph of the victim's back and neck, that was also covered in [larvae]," appears to be a reference to State's Exhibit 37G, which shows Jason's body turned to face downwards, so that the photograph shows the back of Jason's head, the back of his shoulders, and his back. Jason's head is partially covered in larvae. It also shows noticeable dark-brown-to-black discoloration on Jason's head and shoulders and excoriation marks on Jason's back. In its decision/entry on the motion in

limine, the trial court found that Exhibit 37G was admissible under Evid.R. 403. The court agreed with the state's argument that the photograph supported the state's theory that Jason was "dragged along the road to the ditch where his body was left and covered in grass clippings." The trial court also found that Exhibit 37G's depiction of skin discoloration was probative of the timeframe of Jason's death. However, the trial court found that the autopsy photograph that Angelina's counsel described as "a close-up of the victim's face" was inadmissible. The court reasoned that while the photograph did show skin discoloration relevant to the time of Jason's death, similar discoloration was shown in the other three photographs, and that the photograph was thus "both prejudicial and cumulative under Evid.R. 403." Finally, while Angelina's trial counsel objected to a whole additional category of photographs—"any photos of the victim's reflected scalp"—the trial court made no ruling on the admissibility of those photographs in its decision/entry on the motion.[2] It is unclear why the trial court did not specifically address the reflected scalp photographs, but we note that at the hearing on the motion, Angelina's counsel stated that "Last week, the State did indicate to us that they no longer intend to admit the reflected scalp photo."

{¶53} During trial, the state sought to admit the three photographs that the trial court ruled were admissible in its decision/entry granting in part and denying in part the motion in limine. Angelina objected and the trial court overruled Angelina's objections. The photographs were then admitted and published to the jury.

{¶54} In her appellate brief, Angelina argues that the trial court erred in admitting "duplicative photos of the crime scene that were especially gruesome," including "(1) a close-up of a bloodied face with a significant number of larvae, (2) a photo of the victim's back and neck that was also covered in larvae (3) a close-up of the victim's face consisting

---

2 The reference to photographs of Jason's "reflected scalp" is to photographs in which the skin of Jason's scalp was pulled back from Jason's skull for autopsy purposes.

of significant bruising and discoloration, and (4) any photos of the victim's reflected scalp."

Angelina's arguments appear to concern Exhibits 6U, 6V, 37G, and unidentified photographs of Jason's reflected scalp. We will analyze the admissibility of these photographs in turn.

### 3. Analysis of Reflected Scalp Photographs

**{¶55}** First, we note that the state did not introduce evidence at trial showing Jason's reflected scalp and Angelina identifies no exhibit that forms the basis of this alleged error for appellate review. Since no photograph depicting Jason's reflected scalp was introduced at trial, Angelina's objection to reflected scalp photographs is not a proper basis for appeal. Accordingly, Angelina's argument related to any alleged gruesome photograph depicting Jason's reflected scalp lacks merit.

### 4. Analysis of Crime Scene Photographs

**{¶56}** Upon review, we find the trial court did not abuse its discretion in its decision allowing the state to present Exhibits 6U and 6V, taken at the scene where Jason's body was found. Although gruesome, we find the probative value of these photographs is not substantially outweighed by any danger of unfair prejudice. Evid.R. 403(A).

**{¶57}** Both Exhibits 6U and 6V are relevant to show the manner and circumstances of Jason's death and the disposal of his body. The photographs are taken from different angles and show that Jason's body was covered in grass clippings. The photographs also show how Jason was found by authorities and corroborate Dr. Dean's testimony about insect activity. Specifically, the insect activity allowed Dr. Dean to agree that the evidence supported the state's position that Jason had been dead for about 48 hours prior to being found. Accordingly, the two crime scene photographs are probative of the manner and circumstances of Jason's death. *State v. Barnette*, 12th Dist. Butler No. CA2012-05-099, 2013-Ohio-990, ¶ 33 (gruesome photographs relevant to manner and circumstances

surrounding the victim's death); *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 85 (gruesome photographs helped explain shooter's intent, manner and circumstances of death, and the testimony of the officers who discovered and processed the scene). In this case, both photographs are distinct and focus on different details regarding Jason's body and the crime scene environment. Therefore, we agree with the trial court that the probative value outweighs any danger of unfair prejudice and that the photographs were admissible under Evid.R. 403(A). The trial court did not abuse its discretion when it allowed the state to present Exhibits 6U and 6V.

### 5. Analysis of Autopsy Photograph

{¶58} Upon review, we find the trial court did not abuse its discretion when it allowed the state to present Exhibit 37G, taken during Jason's autopsy. As with Exhibits 6U and 6V, we agree that Exhibit 37G is gruesome. That said, we also find that the probative value of this photograph outweighs any danger of unfair prejudice. Evid.R. 403(A). Exhibit 37G shows the extent of the larvae activity on Jason's body, which is only partly visible in the images from the crime scene. Once again, that larvae activity specifically allowed Dr. Dean to establish a timeframe for Jason's death. The photograph also depicts the significant discoloration that was more pronounced on his head. Dr. Dean stated that injured tissues decompose faster than tissue that has not suffered trauma. In addition, we note that this photograph also shows visible dirt and excoriations on Jason's body that supports the state's theory that Jason's body was dragged from the Hamrick residence to the location where his body was discovered about half a mile away. Accordingly, we find Exhibit 37G was admissible and the trial court did not abuse its discretion when it allowed the state to introduce that photograph. *See* Evid.R. 403(A).

### 6. Harmless Error

{¶59} Even if there had been error in the admission of Exhibits 6U, 6V, and 37G, we

find that such error would have been harmless. "An accused has 'a constitutional guarantee to a trial free from prejudicial error, not necessarily one free of all error.'" *State v. Tucker*, 12th Dist. Butler No. CA2010-10-263, 2012-Ohio-139, ¶ 17, quoting *State v. Swartsell*, 12th Dist. Butler No. CA2002-06-151, 2003-Ohio-4450, ¶ 31. Crim.R. 52(A) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." As we explained in *Tucker*, "A finding of harmless error is appropriate where there is 'overwhelming evidence of guilt' or 'some other indicia that the error did not contribute to the conviction.'" 2012-Ohio-139 at ¶ 17, quoting *State v. Sims*, 12th Dist. Butler No. CA2007-11-300, 2009-Ohio-550, ¶ 34. As analyzed in more detail below, the state presented overwhelming evidence of guilt establishing that Angelina committed the aggravated murder of Jason.

{¶60} We overrule Angelina's first assignment of error.

### B. Admission of Demonstrative Exhibit

{¶61} Angelina's Assignment of Error No. 2 states:

{¶62} THE TRIAL COURT ERRED WHEN IT ADMITTED IRRELEVANT EVIDENCE FOUND IN THE ROADWAY PRESENTED BY THE STATE THROUGH AN AERIAL DIAGRAM.

{¶63} In her second assignment of error, Angelina argues the trial court erred by admitting State's Exhibit 9, a piece of demonstrative evidence used at trial. Exhibit 9 is an aerial diagram depicting the Hamrick residence on the far right of the image with the location where Jason's body was found on the left side of the image. Between these two locations are multiple yellow arrows that highlighted where certain pieces of evidence—also presented at trial—were discovered.

{¶64} We review Angelina's challenge to the admission of demonstrative evidence for an abuse of discretion. *State v. Tucker*, 12th Dist. Butler No. CA2017-12-172, 2019-

Ohio-911, ¶ 47. This court has held that "demonstrative evidence is admissible only if (1) it is relevant, (2) it is substantially similar to the object or occurrence that it is intended to represent, and (3) it does not consume undue time, confuse the issues, or mislead the jury." *State v. Hause*, 12th Dist. Warren No. CA2008-05-063, 2009-Ohio-548, ¶ 42.

**{¶65}** Upon review of the record, we find the trial court did not abuse its discretion by admitting Exhibit 9. Angelina claims that certain pieces of evidence found along the roadway were not relevant and their inclusion in the map confused or misled the jury. Although she attacks certain pieces of evidence referenced in the aerial depiction/map as lacking relevance, the location and description of each item had been presented to the jury with no objection from Angelina.

**{¶66}** In this case, Exhibit 9 was merely an aerial representation of where certain pieces of evidence were discovered in relation to the Hamrick residence and the location where Jason's body was found. In other words, the exhibit showed that the items recovered followed a direct path from the Hamrick residence to Jason's body. Certainly, that evidence was probative and consistent with the state's theory that Angelina dragged Jason's body along the roadway from his house to where his body was discovered. Exhibit 9 was relevant, it was substantially similar to what it was intended to represent, and it did not consume undue time, confuse the issues, or mislead the jury. The demonstrative evidence was therefore admissible. *Hause* at ¶ 42. Furthermore, nothing in the record suggests that the danger of unfair prejudice associated with Exhibit 9 substantially outweighed the probative value. Evid.R. 403(A).

**{¶67}** Furthermore, as we mentioned above, the evidence of Angelina's guilt was so overwhelming that even if Exhibit 9's admission were error, such error would have been harmless. *Tucker*, 2012-Ohio-139 at ¶ 17.

**{¶68}** We overrule Angelina's second assignment of error.

## C. Manifest Weight of the Evidence

{¶69} Angelina's Assignment of Error No. 3 states:

{¶70} THE TRIAL COURT ERRED TO THE PREJUDICE OF MS. HAMRICK BECAUSE THE AGGRAVATED MURDER CONVICTION WAS NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE.

{¶71} In her third assignment of error, Angelina argues that her conviction was not supported by the manifest weight of the evidence. In so doing, Angelina challenges: (1) whether the state proved that she caused Jason's death, and (2) whether the state proved that she acted with prior calculation and design.

{¶72} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34. An appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *State v. Blair*, 12th Dist. Butler No. CA2014-01-023, 2015-Ohio-818, ¶ 43.

{¶73} Angelina was convicted of aggravated murder with an accompanying firearm specification. R.C. 2903.01, the aggravated murder statute, states "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." "A

person acts purposely when it is the person's specific intention to cause a certain result * * *." R.C. 2901.22 (A).

{¶74} The phrase "prior calculation and design" is not statutorily defined. Following a comprehensive review of legislative history and prior case law, the Ohio Supreme Court determined that "it is not possible to formulate a bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." *State v. Taylor*, 78 Ohio St.3d 15, 20 (1997).

{¶75} Prior calculation and design requires "'more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and [instead] to require a scheme designed to implement the calculated decision to kill.'" *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 38, quoting *State v. Cotton*, 56 Ohio St.2d 8, 11 (1978). However, "prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264 (2001).

{¶76} The firearm specification of which Angelina was convicted requires that the offender "had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A).

{¶77} Here, the state presented evidence that Angelina both caused Jason's death and that she did so with prior calculation and design. The state presented evidence that Angelina and Jason had a contentious history with one another. Angelina and Jason had separated, but since Jason struggled to afford childcare he allowed Angelina to live in the home to care for the children. Angelina had multiple conversations with her boyfriend,

Clark, about murdering Jason. Clark testified that Angelina discussed shooting, poisoning, or stabbing Jason. However, Clark testified that Angelina mostly talked about shooting Jason in their home. Clark even recounted one instance in which Angelina fired a round out of her son's window to see if law enforcement would respond; they did not. The state corroborated this account with S.H. who witnessed the event and was startled by Angelina's actions.

{¶78} The state presented evidence that on June 28, 2019, Jason was alive and well. He went to work, purchased food, inquired about a future employment opportunity, and stopped to pick up fireworks on his way home. Meanwhile, Angelina was purchasing bleach and disinfectant wipes. In the hours before Jason's murder, Angelina was at a winery discussing her relationship with Jason and suggested, more than once, that the courts were leaving her with no choice but to either flee to Moscow with her children or to kill her husband.

{¶79} Shortly after leaving the winery, Angelina was at a bonfire behind the barn with her children. The state presented evidence that she then went inside and killed Jason. The deputy coroner testified that Jason was killed by a single bullet to the head. There was evidence that Angelina knew Jason had a firearm and could access it. She had recently test fired the weapon outside her son's bedroom window. Based on evidence obtained from the autopsy, the deputy coroner testified that the firearm was placed up against Jason's skull and fired, killing him instantly. Angelina then called her boyfriend to tell him "I did it." According to Clark, she repeated that phrase several times and discussed a "mess on the couch."

{¶80} Angelina then began to clean up the "mess" and sought to conceal her crime. When B.H. came to the door to get water, Angelina told him that she would get it for him. Looking through the glass door, B.H. stated that he could see his father on the couch with

a pillow covering his head.

{¶81} After killing Jason, Angelina drove the children to get pizza and purchased gas. When they returned home, they ate pizza and when they finished Angelina sent the children straight to bed. Then, in the early morning hours, Jason's cell phone traveled from his home in Bethel, Ohio to Bellevue, Kentucky near the Ohio River when it stopped transmitting. This reflects prior plans Angelina had discussed with Clark. As Clark testified, he had told Angelina to get rid of evidence in the Ohio River. Meanwhile, Angelina's phone was left at her house but showed no activity aside from one incoming email.

{¶82} The state bolstered its case with extraordinary investigative resources. Clermont County detectives and crime scene investigators discovered blood droplets throughout the Hamrick residence, but particularly in the living room and in the basement. DNA testing revealed that much of the blood spatters were Jason's blood. Even blood that had been cleaned up was made observable with Bluestar that revealed large amounts of blood in the living room, on the couch, and in the basement. The day after the murder, Angelina purchased more cleaning supplies, including baking soda, which was found covering the living room floor.

{¶83} When Jason's body was recovered, investigators noticed that he was covered in grass clippings foreign to the immediate area. The grass covering Jason matched the clippings found in his own yard. Investigators also noticed that the back of Jason's clothes had been worn away. The deputy coroner testified that Jason had excoriations on his body, or abrasions that occur following death. She testified that the excoriations were consistent with Jason's body having been dragged along a hard surface, such as a road. In the half mile from the Hamrick residence to the location where Jason's body was found, the roadway was littered with denim consistent with clothing that Jason was wearing and that had worn away. There were also pieces of a tarp along the roadway consistent with the hastily cut

Hamrick pool cover.

**{¶84}** While Angelina never confessed to the murder, she offered strange and conflicting comments on the matter. When Angelina learned that cadaver dogs had been on her property near the barn, she told the winery owner, Hornak, that they would not find anything near the barn. During her first interview with Sergeant Boerger, Angelina said that she did not want to see a photograph of the body because she did not like the sight of blood, despite not having been told that the victim had been shot. She also claimed that prior comments to Clark about killing Jason were related to a "detective" game that she owned, but which was never recovered.

**{¶85}** Contrary to Angelina's arguments on appeal, this is a case in which the state presented overwhelming evidence of guilt. The evidence demonstrated that Angelina murdered Jason, that she did so with prior calculation and design, and that she used a firearm to kill Jason when she shot him point-blank in the head. The state therefore proved the elements of aggravated murder as defined in R.C. 2903.01(A) and of the firearm specification as defined in R.C. 2941.145(A).

**{¶86}** To the extent that Angelina challenges the credibility of Clark's testimony, a witness' testimony is an issue for the jury, and "[a] conviction is not against the manifest weight of the evidence merely because the trier of fact believes the testimony of a witness for the state." *State v. Siney*, 12th Dist. Warren No. CA2004-04-044, 2005-Ohio-1081, ¶ 60.

**{¶87}** The jury did not lose its way in convicting Angelina of aggravated murder with the accompanying firearm specification.

**{¶88}** We overrule Angelina's third assignment of error.

### D. Prison Term

**{¶89}** Angelina's Assignment of Error No. 4 states:

- 24 -

{¶90} THE TRIAL COURT ERRED WHEN IT SENTENCED MS. HAMRICK TO A TERM OF IMPRISONMENT THAT WAS EXCESSIVE AND NOT PROPORTIONATE TO THE OFFENSE.

{¶91} The trial court sentenced Angelina to two prison terms. First, with respect to Angelina's conviction for aggravated murder, the court sentenced Angelina to a term of life imprisonment with parole eligibility after serving 30 full years of imprisonment. This sentence was authorized by R.C. 2929.03. Second, with respect to the firearm specification, the court sentenced Angelina to a prison term of three years, which was to be served prior to and consecutive to the life sentence imposed on the aggravated murder offense. This sentence was authorized by R.C. 2929.14(B)(1)(a)(ii). These two sentences, to be served consecutively, combined to in effect constitute a sentence of life imprisonment with the possibility of parole after 33 years.

{¶92} In her fourth assignment of error, Angelina claims her "term of imprisonment" is excessive and not proportionate to the offense. She also claims that the trial court failed to consider the purposes and principles of felony sentencing, and that the court gave improper weight to her lack of remorse, given her contention that she did not kill Jason. Angelina asks that we review her "term of imprisonment" under R.C. 2953.08(G)(2).

{¶93} We pause to note that Angelina's brief is unclear as to whether she asks us to review her aggravated murder life sentence, her firearm specification sentence, or both. Angelina's fourth assignment of error merely refers to a "term of imprisonment." Angelina's "Issue for Review" refers to her "sentence of *life* imprisonment," but the body of her argument refers to her sentence "to life imprisonment with the possibility of parole after 30 years consecutive to the three-year firearm specification." For purposes of this opinion, we will assume that Angelina's fourth assignment of error concerns both of her sentences.

{¶94} We first consider Angelina's life sentence for aggravated murder. R.C.

2929.03 specifically sets forth the sentence for aggravated murder. *See State v. Geran*, 12th Dist. Butler No. CA2019-01-016, 2019-Ohio-3421, ¶ 6. While Angelina asks us to review the sentence under R.C. 2953.08(G)(2), Angelina fails to acknowledge that R.C. 2953.08(D)(3) provides that "a sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review under this section."[3]

**{¶95}** The sentence at issue here was provided for in R.C. 2929.03, which falls within the range of statutes referenced in R.C. 2953.08(D)(3). Since R.C. 2953.08(D)(3) provides that there is no statutory right to review a sentence for aggravated murder, we lack jurisdiction to entertain Angelina's argument related to her life sentence.

**{¶96}** As for Angelina's firearm specification sentence, the trial court did not have discretion in imposing the sentence. Under the relevant statute, when an offender is convicted of the firearm specification, the three-year firearm specification sentence is "mandatory." R.C. 2941.145(A). Angelina's arguments, to the extent that they apply to the firearm specification sentence, lack merit.

**{¶97}** We dismiss Angelina's fourth assignment of error.

### III. Conclusion

**{¶98}** The trial court did not abuse its discretion when it admitted the gruesome photographs that Angelina identifies on appeal. Even if the trial court had erred in admitting those photographs, such error would have been harmless. The same is true for the aerial diagram. The jury's conviction of Angelina was not against the manifest weight of the evidence, and Angelina's assignment of error related to her prison sentence is without merit.

---

3. In *State v. Grevious*, Slip Opinion No. 2022-Ohio-4361, ¶ 1, the Ohio Supreme Court upheld the constitutionality of R.C. 2953.08(D)(3), although it noted that the provision did not preclude appellate review of *constitutional challenges* to an aggravated-murder sentence. Angelina presented no constitutional challenge to her sentence and only argued that the court failed to consider the purposes and principles of felony sentencing.

**{¶99}** Judgment affirmed.

PIPER, P.J., and HENDRICKSON, J., concur.