[Cite as *State v. Delehanty*, 2023-Ohio-337.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-04-041 |
| | : | O P I N I O N |
| - vs - | | 2/6/2023 |
| | : | |
| STORMY DELEHANTY, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 20CR37107

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Thomas G. Eagle Co., L.P.A., and Thomas G. Eagle, for appellant.

**BYRNE, J.**

{¶1} The Warren County Court of Common Pleas convicted Stormy Delehanty[1] of four charges—including murder—arising out of allegations that she stabbed and killed Roman Roshchupkin and attempted to conceal her actions by cleaning the crime scene. Stormy appealed. For the reasons described below, we affirm Stormy's convictions, but we

---

1. Because appellant Stormy Delehanty and witness Daniel Delehanty share the same last name, we will refer to them by their first names.

vacate her sentence and remand to the trial court for purposes of complying with the mandatory advisements of R.C. 2903.42(A)(1), and for resentencing.

## I. Indictment and Trial Summary

{¶2} A grand jury indicted Stormy on four counts: Count One, murder, a violation of R.C. 2903.02(B); Count Two, felonious assault with a deadly weapon, a violation of R.C. 2903.11(A)(2); Count Three, felonious assault causing serious bodily harm, a violation of R.C. 2903.11(A)(1); and Count Four, tampering with evidence, a violation of R.C. 2921.12(A)(1).

{¶3} R.C. 2903.02(B), the murder statute, states that "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." Counts Two and Three, which were both felonies of the second degree, constituted the predicate offenses for Count One.

{¶4} The matter proceeded to a jury trial. We summarize the trial testimony below.

### A. State's Evidence

### 1. Daniel Delehanty's Testimony

{¶5} Daniel Delehanty testified that he was Stormy's 17-year-old brother. Stormy had adopted him when he was seven or eight years old after their parents died. (The record reflects that Stormy was 28 years old at the time of the alleged offenses.) In the summer of 2020 Daniel was living with Stormy and Roshchupkin, who Daniel described as Stormy's boyfriend, in an apartment at 9852 Dartmouth Way in Warren County ("the apartment"). Daniel was not aware whether Stormy and Roshchupkin were married.

{¶6} On Saturday, July 4, 2020, Daniel left the apartment sometime between 8:00 a.m. and noon to be with friends. He returned the following morning, Sunday, July 5, at around 4:00 a.m. The door was locked when he arrived. Daniel banged on the door until

Stormy opened it for him. He observed nothing unusual about Stormy or the apartment. He did not see or hear Roshchupkin inside the apartment.

{¶7} Daniel stated that later that morning he had to go to work. Daniel and Stormy both worked at the same restaurant. Daniel asked Stormy for a ride to work. Stormy told him that he would have to walk and that Roshchupkin could not drive him. He walked to work, leaving a little after noon.

{¶8} Daniel testified that Stormy was supposed to work at the restaurant that day as well. But she never appeared. He assumed that she and Roshchupkin were hungover. He stated that they "like to drink." They were not "wasted every single day," but they were "pretty heavy drinkers."

{¶9} Daniel ended his work shift and called Stormy and Roshchupkin repeatedly, trying to get them to pick him up. Neither responded. Finally, Stormy answered. She told him that he would need to walk home. He managed to get a ride home and arrived at the apartment at about 10:30 or 11:00 p.m.

{¶10} When Daniel arrived at the apartment, he noticed sheets and paintings covering the windows. This was unusual. However, he did not ask Stormy about the window coverings.

{¶11} Daniel estimated that he went to bed sometime early in the morning of Monday, July 6. After he woke up, he spent most of the day in bed. He did not see either Stormy or Roshchupkin that day.

{¶12} At some point, intending to do laundry, Daniel began searching the apartment for quarters. He looked in several rooms before going to the master bedroom, where Stormy and Roshchupkin slept. It was locked. He "shimmied the door open." Daniel was on the phone talking with his girlfriend when he saw blankets on the floor and thought "someone's passed out." His girlfriend made a comment that "it's a dead body." He decided

to take a closer look. He peeled back the blankets and found Roshchupkin's deceased body.

{¶13} Daniel called 9-1-1. The state played the audio recording at trial. On the recording, Daniel stated that he had not seen Stormy or Roshchupkin in "like two days" and that Stormy was "being weird." Daniel reported that Roshchupkin had a car, a white Mazda.

### 2. Deputy Sara Vaught's Testimony

{¶14} Deputy Sara Vaught testified she was a deputy with the Warren County Sheriff's Office assigned to the crime scene unit. On July 6, 2020, she responded to a dispatch to investigate a possible dead body at the apartment.

{¶15} Deputy Vaught took numerous photographs of the scene within the apartment, including various photographs of Roshchupkin's body—wrapped in sheets—in the master bedroom. These photographs were admitted into evidence and Deputy Vaught testified concerning what was depicted in each photograph and what she found as she was processing the scene.

{¶16} Deputy Vaught believed that someone moved Roshchupkin's body. In this regard, she photographed a belt near the body that someone had cinched tight, "almost to a leg diameter." Deputy Vaught photographed the master bedroom and noted that there were no "major signs of a struggle" occurring in that location.

{¶17} Deputy Vaught observed that there was a pillowcase tied around Roshchupkin's midsection. The knotting was so tight that investigators could not untie it at the scene. Deputy Vaught observed indications of massive trauma to Roshchupkin's head and neck area, but no obvious signs of trauma to his face.

{¶18} Deputy Vaught took photographs of the apartment's dining room and living room areas. These rooms were closer to the entry to the apartment, and the furthest rooms away from the master bedroom. One photograph of the dining room depicted a blanket or

- 4 -

sheet covering a window.

{¶19} In the living room area, Deputy Vaught photographed several areas which she believed showed visible blood stains. One such area was on the floor. Another area was on multiple vertical white blinds covering a sliding glass door.

{¶20} In the apartment's kitchen, Deputy Vaught photographed a knife block that was missing knives. The knife brand was KitchenAid.

{¶21} Deputy Vaught identified the sheets and pillowcase that were wrapped around Roshchupkin's body as coming from bunk beds located in the middle bedroom. The pillowcase was also the same type that had been hung over a window in the dining room.

{¶22} Deputy Vaught photographed two plastic trash bags and a bucket full of a red liquid that was found in the master bedroom's ensuite bathroom.

{¶23} Deputy Vaught applied a forensic investigative product called "Bluestar" to areas within the apartment that she believed might reveal latent blood. Under the appropriate lighting conditions and in the presence of blood, Bluestar reacts with luminescence. Deputy Vaught reviewed a series of photographs indicating where Bluestar had revealed latent blood.

{¶24} Bluestar revealed additional blood on the vertical blinds in the living room. There was also a Bluestar pattern on the floor down the hallway from the living room towards the master bedroom, in the width of a human body. In the ensuite bathroom, one photograph depicted a clean sink. But when Deputy Vaught applied Bluestar to the same sink, she observed a reaction around the sink basin, which indicated an attempt to clean up blood. There were also footprints observed in a Bluestar reaction on the floor in front of the sink. The mop bucket reacted to Bluestar, as did one of the nearby trash bags.

{¶25} Deputy Vaught testified about the contents of the trash bags in the ensuite bathroom. The following items, all bloodstained, were recovered when the trash bags were

emptied: a bottle of Blue Moon beer, cleaner bottles, bloody towels, numerous paper towels covered in blood and feces, a bra, sports shorts, and a white tank top.

### 3. Dr. Anna Richmond's Testimony

{¶26} Dr. Richmond testified that she was a forensic pathology fellow at the Montgomery County Coroner's office. Dr. Richmond performed Roshchupkin's autopsy.

{¶27} Roshchupkin's body had been wrapped in three blankets. He had 33 superficial, non-fatal wounds in various locations, including on his arms and knees. Dr. Richmond noted multiple wounds that displayed a serrated pattern, indicating the use of a serrated weapon.

{¶28} Roshchupkin's body also displayed five stab wounds. These were located on his neck, back, chest, and two in his left arm. The chest wound and the stab wounds to the arm were non-fatal.

{¶29} The stab wound on Roshchupkin's back was two inches deep and pierced Roshchupkin's lung. Dr. Richmond opined that this wound would have caused blood to start pooling in Roshchupkin's chest cavity. This was a significant, possibly fatal injury. There were visible indications that a serrated weapon caused this stab wound.

{¶30} The stab wound on Roshchupkin's neck was one-and-one-half inches deep. This wound, which also visibly corresponded with a serrated weapon, pierced Roshchupkin's jugular vein and would have caused "massive" bleeding.

{¶31} Dr. Richmond opined that Roshchupkin's cause of death was multiple sharp force injuries.

### 4. Detective Nicholas Behymer's Testimony

{¶32} Detective Nicholas Behymer of the Warren County Sheriff's Office testified that he investigated bank activity connected with a Fidelity joint checking account registered to Roshchupkin and Stormy. On July 6, 2020, transaction records indicated a $7,000

transfer from the couple's joint account to Stormy's individual bank account. Also on July 6, the account showed a transaction charge at a Radisson Hotel in Covington, Kentucky.

{¶33} Beginning on July 9, 2020, Detective Behymer began receiving real-time updates on the use of the debit card tied to the joint checking account. That day, a transaction occurred in Green River, Utah. The next day, July 10, several debit transactions occurred at the Stratosphere Casino in Las Vegas, Nevada, including multiple cash withdrawals from casino ATMs.

### 5. Detective Jerry Mauch's Testimony

{¶34} Detective Jerry Mauch testified that he worked for the Las Vegas Metropolitan Police Department ("LVMPD"). LVMPD's criminal apprehension team received information that Stormy was wanted and was possibly in Las Vegas. On July 11, 2020, a patrol officer spotted a white 2010 Mazda parked at Boulder Station Casino. Later, the criminal apprehension team arrived at that location and was able to arrest Stormy without incident.

{¶35} When the apprehension team arrested Stormy, she had lacerations on her left arm. She had a gray duffel bag. Inside the bag was a handwritten note that stated, "On July 4th, I killed my husband accidentally."

### 6. Detective Brandon Abshear's Testimony

{¶36} Detective Brandon Abshear, with the Warren County Sheriff's Office, testified that after the LVMPD detained Stormy, he and another detective flew out to Las Vegas. In the meantime, the LVMPD had secured Roshchupkin's Mazda. Once in Las Vegas, Detective Abshear photographed and inventoried the contents of the vehicle and the gray duffel bag.

{¶37} In addition to the letter about accidentally killing Roshchupkin, the bag contained several other handwritten letters. One letter, dated July 6, 2020, stated Roshchupkin's name, stated that he was from "Veronish," Russia, and asked the reader to

"notify the Russian Embassy in Washington D.C. so his parents can be notified."

**{¶38}** Detective Abshear collected a white towel from the vehicle that appeared to be stained with blood. Detective Abshear testified that when he interviewed Stormy, she acknowledged this towel and indicated that she used it to wipe away blood from wounds she had self-inflicted while at the Radisson Hotel.

**{¶39}** Officers recovered a pillowcase in the vehicle. Inside the pillowcase were two KitchenAid kitchen knives. One was a chef's knife. The other was a bread knife with a serrated edge.

**{¶40}** Detective Abshear testified about a series of exhibits, consisting of still photographs and video recordings. When considered together, these exhibits presented a visual timeline of Stormy's activities leading up to and following Roshchupkin's death. The video recordings were obtained from a neighbor's doorbell video camera that happened to be pointing at the front of the apartment. Still photographs were also produced from security cameras inside various stores Stormy visited on July 5, 2020. The video recordings and photographs showed the following activities on the dates indicated.

### *July 4, 2020*

- 4:34 p.m.: Roshchupkin's white Mazda pulls into a parking spot outside the apartment. Roshchupkin and Stormy emerge from the vehicle and enter the apartment together. Minutes later, Roshchupkin exits the apartment alone, enters the Mazda, and drives away.

- 4:53 p.m.: Roshchupkin returns to the apartment in the Mazda. This is the last time he is seen alive.

### *July 5, 2020*

- 4:08 a.m.: A car drops off Daniel outside the apartment. Stormy opens the door and lets him inside.

- 12:13 p.m.: Daniel leaves the apartment on foot.

- 12:55 p.m.: Stormy leaves the apartment, gets into the Mazda, and drives away.

- Between 1:34 p.m. and 5:27 p.m.: Stormy is observed on security camera at various stores making purchases. She purchases floor cleaner at Ace Hardware. She purchases a bath scrub brush, Pepto Bismol, spot stain remover, cleaner, trash bags, and a mop at Kroger. She purchases a pruning saw and hedge shears at Home Depot. She purchases cigarettes, snacks, and drinks at Speedway. She purchases a duffel bag at Target. She purchases Bactine at CVS.

- 5:37 p.m.: Stormy arrives back to the apartment in the Mazda.

- 10:50 p.m.: A vehicle drops off Daniel outside the apartment.

### *July 6, 2020*

- 2:54 p.m.: Stormy exits the apartment with a black trash bag in hand. She walks to the Mazda and drives away.

- 4:35 p.m.: Stormy checks into the Radisson Hotel in Covington, Kentucky.

- 8:23 p.m.: Daniel is seen on the doorbell camera footage walking in and out of the apartment while he contacts 9-1-1.

- 8:26 p.m.: The first deputy from the Warren County Sheriff's Office arrives on scene.

**{¶41}** Detective Abshear further testified that after her arrest, Stormy contacted him from the Warren County Jail, stating that she wished to speak with him. On August 8, 2020, Detective Abshear met with Stormy and interviewed her. The interview was recorded.

### 7. Stormy Delehanty's Recorded Interview

**{¶42}** The recording of Detective Abshear's approximate two-hour interview with Stormy was played at trial. At the outset of the interview, Stormy admitted to Detective Abshear that "I'm the one who did it" and "It's just me." That said, she also claimed that she could not remember anything about what happened because "I was extraordinarily intoxicated."

- 9 -

{¶43} Stormy explained that on July 4, she and Roshchupkin started drinking. She consumed four 8%-alcohol beers in about one and one-half hours. Then she started drinking Hennessey cognac.

{¶44} Stormy recalled that at some point she was in the master bedroom with Roshchupkin, listening to music. He threw her off the bed and onto the floor and "had my wrists back." Then, the next thing she could recall was "him on the ground in a puddle of blood * * * by the front door." Stormy stated she did not know why Roshchupkin threw her off the bed, just that they were on the bed listening to music and "the next thing I know is we're on the floor and he's on top of me."

{¶45} Stormy claimed to have no memory of stabbing Roshchupkin and stated, "It wasn't me. I wasn't consciously in control. * * * It was like being a marionette. I remember starting to clean up the blood * * * I remember wiping it all up." Stormy said she was on "auto-pilot" as she cleaned up the scene. Stormy also recalled dragging Roshchupkin down the hallway on a blanket. She wrapped the blanket around him and pulled. When she answered the door for Daniel, everything was clean.

{¶46} Stormy thought about hiding Roshchupkin's body, but realized she was not going to be able to go through with it. That was when she decided to leave. When she was at the Radisson Hotel in Kentucky, she wrote the handwritten notes that the police later found in the duffel bag. She stated to Detective Abshear that she intended to kill herself at the Radisson, but she could not go through with it.

## B. Defense Case – Stormy's Testimony

{¶47} Stormy testified in her defense at trial. She explained that she first met Roshchupkin in August 2018. They began dating in January 2019. She moved into the apartment in February 2019 and Roshchupkin moved in with her in August 2019.

{¶48} In March 2019, Roshchupkin asked Stormy to marry him. In the moment, she

said "yes." She knew that Roshchupkin was an illegal immigrant. While she was suspicious of his intentions, he denied that his marriage proposal was "all about the green card." They married in August 2019.

{¶49} Stormy testified at length concerning her personal history, which included family trauma, rape, and a prior abusive romantic relationship. Stormy stated that these previous experiences, coupled with her own personal struggle with alcoholism, and other "things that were going on in my household" between she and Roshchupkin, "led" to what occurred on July 4, 2020.

{¶50} Stormy also testified about the events of July 4. She and Roshchupkin were drinking that day. Roshchupkin was agitated about financial and immigration issues. He threw a box of checkbooks and credit cards at her. She was not sure why he threw this box at her.

{¶51} Later, she was in the bedroom with Roshchupkin. She was "fumbling through [Roshchupkin's] phone to play music." She started clicking on his text messages and found a photograph of a "girl" in a towel with her hair in a towel. She asked Roshchupkin about the girl. Roshchupkin looked at her "like I was silly" and then he "ends up pushing me off the bed." Then, Roshchupkin was on top of her and was screaming, "is this what you want?"

{¶52} Roshchupkin then got up and went back to the bed. Stormy followed him back to the bed. She started questioning him again about the girl and he threw her off the bed a second time. This time she hit her head on a guitar amplifier positioned near the side of the bed. She testified that, "next thing I know * * * I'm cleaning up blood."

{¶53} Stormy claimed that when she came out of her blacked-out state she found Roshchupkin stabbed, lying in the small entryway behind the entry door, which leads into the dining room/living room area.

{¶54} Stormy claimed that July 4 was not the first time Roshchupkin had attacked

her. She explained that she did not report him to police when he allegedly previously attacked her due to his immigration status. Stormy testified that one of Roshchupkin's "favorite things" was to tell her to kill herself and that no one cared about her. Stormy also said that on "numerous" occasions, Roshchupkin had attempted to kill her "with his car." She said that he was very dominant and controlling.

{¶55} Stormy acknowledged that the story she told at trial did not match the story she told Detective Abshear during her interview. She explained the stories did not match because she had not contacted Detective Abshear to discuss the case, but rather to find out what happened to Roshchupkin's body. Stormy stated that she said nothing to Detective Abshear or other investigators about domestic violence, prior sexual abuse, or her history of abuse because no one asked her questions about those issues.

{¶56} On cross-examination, the state asked Stormy to provide details concerning the multiple times that she claimed Roshchupkin tried to kill her with his car. Stormy stated that Roshchupkin had attempted to kill her three times. First, Roshchupkin tried to run her over with a car in July 2019, about one month prior to their marriage. Second, Roshchupkin tried to drive his car into a telephone pole while she was inside. She could not recall the third time Roshchupkin had allegedly tried to kill her.

{¶57} Also on cross-examination, Stormy subtly backed off from her admission that she killed Roshchupkin and for the first time raised the possibility that someone else had killed him. Specifically, she stated that she could not "confirm or deny" whether there was someone else in the apartment at the time of Roshchupkin's murder that might have been responsible for his death. She then stated that "theoretically it is plausible that I was involved in this incident."

## C. Verdict and Sentence

{¶58} After deliberation, the jury convicted Stormy on all four counts. The court

sentenced her to a combined sentence of 18 years to life in prison. The court, in its sentencing entry, stated that Stormy was required to register with the Violent Offender Database. It also stated that Stormy would be subject to the supervision of the Adult Parole Authority upon her release from prison "for the remainder of her life pursuant to R.C. 2967.13."

{¶59} Stormy appealed, raising four assignments of error. We will address her assignments of error out of order.

## II. Law and Analysis

## A. Gruesome Photographs

{¶60} Stormy's Assignment of Error No. 1 states:

{¶61} THE TRIAL COURT ERRED IN THE ADMISSION OF MEDICAL PHOTOS.

{¶62} Stormy argues that the trial court abused its discretion when it admitted certain crime scene and autopsy photographs. Specifically, Stormy argues the trial court erred in admitting State's Exhibits 7, 8, 9, 14, 15, 20, 21, 81-84, 86-93, 95-1, and 95-2. Stormy argues that the photographs were gruesome, served little or no purpose, and that their probative value did not outweigh the danger of prejudice.

### 1. Applicable Law

{¶63} Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Under Evid.R. 403(A), only evidence that is unfairly prejudicial is excludable. *State v. Wright*, 48 Ohio St.3d 5, 8 (1990). Logically, all evidence presented by the state is prejudicial, but not all evidence unfairly prejudices a defendant. *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 107. Evid.R. 403(B) provides that a trial court "may" exclude evidence "if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of

cumulative evidence."

**{¶64}** The admission or exclusion of evidence is a matter committed to the sound discretion of the trial court. *State v. Meredith*, 12th Dist. Warren No. CA2004-06-062, 2005-Ohio-062, ¶ 7. Absent an abuse of discretion, this court will not reverse the trial court's decision to admit or exclude relevant evidence. *Id.* An abuse of discretion implies that the trial court's decision was "unreasonable, arbitrary, or unconscionable." *State v. Motz*, 12th Dist. Warren No. CA2009-10-137, 2010-Ohio-2170, ¶ 12.

**{¶65}** "The mere fact that a photograph may be gruesome or horrendous is not sufficient to render it per se inadmissible." *State v. Benge*, 12th Dist. Butler No. CA93-06-116, 1994 WL 673126, *14 (Dec. 5, 1994), citing *State v. Maurer*, 15 Ohio St. 3d 239, 265 (1984). This is true even if the defendant stipulated to the cause of death. *Id.* A trial court may admit gruesome photographs if they provide the jury with an appreciation of the nature and circumstances of the crimes. *State v. Monroe*, 105 Ohio St. 3d 384, 2005-Ohio-2282, ¶ 26. In other words, consistent with Evid.R. 403, "[g]ruesome photographs are admissible at trial as long as their probative value is not substantially outweighed by the danger that the accused will be unfairly prejudiced."[2] *State v. Houston*, 1st Dist. Hamilton No. C-190598, 2020-Ohio-5421, ¶ 43.

### 2. Analysis of Challenged Photographs

**{¶66}** Stormy argues that the court erred in admitting State's Exhibits 7, 8, 9, 14, 15, 20, 21, 81 through 84, 86 through 93, 95-1 and 95-2. Prior to the publication of any of the

---

2. In her initial brief, Stormy argued that we should use a different standard than the one outlined above when reviewing the trial court's decision regarding the admission of gruesome photographs. Specifically, Stormy asserted that a "gruesome photograph is admissible only if its 'probative value * * * outweigh[s] the danger of prejudice to the defendant.'" But the cases that Stormy cited in support of her assertion were all capital cases. *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, ¶ 237; *Maurer*, 15 Ohio St.3d at 264-65; *State v. Thompson*, 33 Ohio St.3d 1, 9 (1987). Indeed, the Ohio Supreme Court has explained that the standard Stormy urges we apply is to be applied in capital cases, but not in non-capital cases. *State v. Mammone*, 139 Ohio St. 3d 467, 2014-Ohio-1942, ¶ 95-96. Stormy conceded as much in her reply brief.

photographs to the jury, Stormy's counsel objected to these photographs (and others not challenged on appeal) on the basis that they were prejudicial. The trial court reviewed each photograph individually and considered the state's explanation for the relevance of each photograph. After this review, the court excluded only one photograph – State's Exhibit 20 – and admitted the remainder. Given that the court *excluded* State's Exhibit 20, we need not consider Stormy's challenge to the "admission" of that exhibit. *State v. Hamrick*, 12th Dist. Clermont No. CA2021-06-028, 2023-Ohio-117, ¶ 55 ("Since no photograph depicting [the victim's] reflected scalp was introduced at trial, [the defendant's] objection to reflected scalp photographs is not a proper basis for appeal. Accordingly, [the defendant's] argument related to any alleged gruesome photograph depicting [the victim's] reflected scalp lacks merit").

{¶67} Moving now to the photographs that Stormy challenges on appeal that *were* admitted at trial, we note that on appeal, Stormy fails to state any individual concerns with the submitted photographs. Stormy merely refers to them, generically, as repetitive, gruesome, and unfairly prejudicial.

{¶68} State's Exhibit 7 consists of a photograph of the entryway to the master bedroom. Roshchupkin's body is not depicted in the photograph, nor is there anything else that could be described as gruesome. There is no other photograph depicting this angle of the apartment. It is not repetitive.

{¶69} State's Exhibits 8, 9, 14, and 15 consist of different viewing angles of Roshchupkin's body, wrapped in blankets, in the master bedroom. While the photographs depict some blood smearing and a stab wound to Roshchupkin's back, the photographs are not overly gruesome. They are not repetitive as they show different angles of the crime scene.

{¶70} Exhibit 21 is the only crime scene photograph that depicted Roshchupkin's

face as it appeared at the scene. The photograph, while unpleasant, is not gruesome. The photograph reveals that there were no obvious injuries or wounds to Roshchupkin's face. It is not repetitive.

**{¶71}** Exhibits 81 through 84, 86 through 93, 95-1 and 95-2 are all photographs taken during Roshchupkin's autopsy. The photographs depict the numerous wounds documented by Dr. Richmond. As described in the above summary of Dr. Richmond's testimony, some of the photographs depict features suggesting the attacker use a serrated weapon. Photographs 95-1 and 95-2 are zoomed-in photographs of the injuries to Roshchupkin's jugular vein. In conjunction with Dr. Richmond's testimony concerning the effects of such an attack, these photographs were relevant to demonstrate how the stab wound to the neck was a fatal wound. The autopsy photographs are "gruesome" in the sense that autopsy photographs generally depict graphic injuries or surgical techniques necessary to conduct a postmortem examination. However, these photographs present an accurate and objective depiction of the numerous wounds present on Roshchupkin's body.

**{¶72}** Each challenged photograph served a distinct purpose, including showing where and how Roshchupkin's body was found and where the various wounds were located on Roshchupkin's body. Due to the large number of wounds present on Roshchupkin's body, complete documentation necessarily required multiple photographs. The photographs were relevant to the various issues potentially at issue at the criminal trial, such as the identity of the perpetrator (someone using a serrated weapon taken from the apartment), and the direction from which Roshchupkin was attacked (potentially negating a claim of self-defense). The challenged photographs provided the jury with "an appreciation of the nature and circumstances of the crimes." *Hamrick*, 2023-Ohio-117 at ¶ 47, citing *State v. Monroe*, 105 Ohio St. 3d 384, 2005-Ohio-2282, ¶ 26. *Accord State v. Barnette*, 12th Dist. Butler No. CA2012-05-099, 2013-Ohio-990, ¶ 32-33 (gruesome photographs

relevant to manner and circumstances surrounding the victim's death); *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 85-86 (gruesome photographs helped explain shooter's intent, manner and circumstances of death, and the testimony of the officers who discovered and processed the scene). The relevance of the photographs to the state's case was great and the danger of unfair prejudice to Stormy was minimal. The challenged photographs' probative value was not substantially outweighed by the danger that Stormy would be unfairly prejudiced. *Houston*, 2020-Ohio-5421 at ¶ 43. For all these reasons, the trial court did not abuse its discretion in admitting the challenged photographs.

{¶73} Even if there had been error in the admission of any of the exhibits that Stormy challenges on appeal, we find that such error would have been harmless. "An accused has 'a constitutional guarantee to a trial free from prejudicial error, not necessarily one free of all error.'" *State v. Tucker*, 12th Dist. Butler No. CA2010-10-263, 2012-Ohio-139, ¶ 17, quoting *State v. Swartsell*, 12th Dist. Butler No. CA2002-06-151, 2003-Ohio-4450, ¶ 31. Crim.R. 52(A) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." As we explained in *Tucker*, "[a] finding of harmless error is appropriate where there is 'overwhelming evidence of guilt' or 'some other indicia that the error did not contribute to the conviction.'" 2012-Ohio-139 at ¶ 17, quoting *State v. Sims*, 12th Dist. Butler No. CA2007-11-300, 2009-Ohio-550, ¶ 34. As described in detail in Section I of this Opinion, the state presented overwhelming evidence of guilt establishing that Stormy murdered Roshchupkin.

{¶74} We overrule Stormy's first assignment of error.

### B. Self-Defense Instruction

{¶75} Stormy's Assignment of Error No. 2 states:

{¶76} THE TRIAL COURT ERRED IN NOT GIVING A JURY INSTRUCTION ON SELF-DEFENSE.

**{¶77}** Stormy argues that the trial court erred when it denied her request for a jury instruction on self-defense.[3] She argues that there was evidence submitted at trial that Roshchupkin had abused her in the past and that he assaulted her prior to the stabbing.

### 1. Applicable Law

**{¶78}** "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 240. A court of appeals reviews a trial court's refusal to give a requested jury instruction for an abuse of discretion. *Id.*, citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989).[4]

**{¶79}** The elements of self-defense are (1) that the defendant was not at fault in creating the situation giving rise to the affray, (2) the defendant had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape from such danger was in the use of such force, and (3) the defendant did not violate any duty to retreat or avoid danger. *State v. Sturgill*, 12th Dist. Clermont No. CA2020-03-018, 2020-Ohio-6665, ¶ 20, citing *State v. Ray*, 12th Dist. Butler No. CA2012-10-213, 2013-Ohio-3671, ¶ 26, and *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).

---

3. The trial court granted Stormy's request for an instruction on voluntary manslaughter but denied her request for a self-defense instruction, finding that the two jury instructions were inconsistent. The state argues on appeal that the two instructions would have been inconsistent. We need not address this issue because, as we will explain below, the testimony and evidence in this case did not warrant a self-defense instruction.

4. The state argues that we should review this issue for plain error, arguing that Stormy's trial counsel equivocated on requesting a self-defense instruction and did not object to the omission of the instruction in the court's final jury charge. Upon our review of the proceedings, we find that defense counsel requested the instruction. During the trial, defense counsel indicated he would be requesting a self-defense instruction based on the evidence presented. The trial court noted defense counsel's request prior to discussing and deciding the issue by stating, "we have been discussing the issue with regard to the requested instructions by the defense of self-defense and [voluntary] manslaughter." We do not think it was necessary for counsel to have requested the self-defense instruction again, immediately prior to the final jury charge, in order to preserve this issue for appellate review. Crim.R. 51 ("An exception, at any stage or step of the case or matter, is unnecessary to lay a foundation for review, whenever a matter has been called to the attention of the court by objection, motion, or otherwise, and the court has ruled thereon.").

## 2. Propriety of Self-Defense Instruction

**{¶80}** The trial court did not abuse its discretion when it denied Stormy's request for a self-defense instruction because there was no evidence presented supporting a charge of self-defense. Stormy did not testify that she had a bona fide belief that she was in imminent danger of death or great bodily harm from any action by Roshchupkin and there were no facts presented at trial that support such a finding. Stormy denied having any memory of what occurred immediately prior to the stabbing and denied knowing how or why she inflicted 38 knife wounds on Roshchupkin. At most, at some indeterminant time before the stabbing, Roshchupkin pushed Stormy off a bed twice, yelled at her, and briefly held her down. Stormy hit her head on a guitar amplifier near the bed and remembers nothing else until she was "cleaning up blood."

**{¶81}** There was no evidence presented of any defensive injuries suffered by Stormy. There was evidence of lacerations on Stormy's body, but she admitted that she self-inflicted those lacerations while contemplating suicide at the Radisson Hotel.

**{¶82}** Stormy did not testify that Roshchupkin used or threatened to use any deadly force or weapons during their disagreement about the woman whose photo Stormy found on Roshchupkin's phone. Stormy did not testify that Roshchupkin did anything physically to Stormy on the day she killed him that would have reasonably made her believe he intended to use deadly force or to inflict great bodily harm. And Stormy's admission that she tried to conceal Roshchupkin's death belies the claim that she attacked Roshchupkin out of bona fide fear for her life.

**{¶83}** There was also no evidence presented that would establish that Stormy believed that she had to use deadly force in self-defense. Stormy, in fact, waivered on whether she used any force. While she conceded that "theoretically it is plausible I was involved in this incident" she also stated that it was possible that someone else was present

in the apartment when Roshchupkin was stabbed to death. Self-defense is a justification for "admitted conduct." *State v. Edgerson*, 8th Dist. Cuyahoga No. 101283, 2015-Ohio-593, ¶ 17, citing *State v. Martin*, 21 Ohio St.3d 91, 94 (1986).

{¶84} In *Edgerson*, the state charged and convicted the defendant with aggravated assault for stabbing the victim three times with a knife. *Id*. at ¶ 3, 5. On appeal, Edgerson argued that the jury should have been instructed on self-defense. *Id*. at ¶ 14. The appeals court disagreed. *Id*. at ¶ 17. The court noted that the defense theory of the case was that the victim's wounds could have been self-inflicted and that Edgerson never had a knife and did not know how the victim's injuries occurred. *Id*. at ¶ 17-18. The court observed that it was logically and legally inconsistent for the defendant to deny the assault charges but also to assert that the defendant acted in self-defense. *Id*. at ¶ 18. Here too, an instruction on self-defense would be logically and legally inconsistent with Stormy's claim that she was potentially not involved in Roshchupkin's stabbing.

{¶85} In her appellate brief, Stormy argues that the fact that she testified about a history of abuse, and specifically the mental and physical abuse she alleged she was subjected to by Roshchupkin, warranted giving the jury the chance to determine whether she acted in self-defense. In essence, Stormy suggests that she suffered battered woman syndrome—without using that phrase, and without having called an expert witness—and that the syndrome may have contributed to a mistaken, but bona fide belief of imminent danger.

{¶86} In *State v. Sallie*, 81 Ohio St.3d 673, 675-676 (1998), the Ohio Supreme Court held that evidence of battered woman syndrome is admissible when the defendant mistakenly believed the circumstance warranted the use of deadly force in self-defense, but that such mistake was demonstrated reasonable in light of suffering from the syndrome. *Id.* at 676. In *Sallie*, the court held that evidence related to the syndrome was immaterial

because the defendant did not claim self-defense at all, and instead stated that the shooting was an accident. *Id.*

{¶87} Here too, Stormy's battered-woman-syndrome-type argument would be immaterial because Stormy never claimed that she mistakenly used deadly force against Roshchupkin based on her prior history. There was no evidence presented connecting Stormy's alleged prior abuse, battered woman syndrome, or any other mental condition or defect with a claim of self-defense. In essence, Stormy is inviting total speculation that alleged past abuse justified a self-defense killing she committed while allegedly intoxicated beyond the ability to remember any of her actions. "If the evidence brought forward generated only mere speculation of a self-defense claim, such evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury is unwarranted." *State v. Towson*, 12th Dist. Warren No. CA2021-08-069, 2022-Ohio-2096, ¶ 23.

{¶88} For all these reasons, the trial court did not abuse its discretion in denying Stormy's request for an instruction on self-defense. *Adams*, 2015-Ohio-3954 at ¶ 240. We overrule Stormy's second assignment of error.

### C. Violent Offender Registry

{¶89} Stormy's Assignment of Error No. 4 states:

{¶90} THE TRIAL COURT ERRED IN REQUIRING APPELLANT TO ENROLL IN THE VIOLENT OFFENDER REGISTRY.

{¶91} In its sentencing entry, the trial court stated that, "Defendant will be required to register with the Violent Offender Database pursuant to R.C. 2903.41 et seq." Stormy argues that R.C. 2903.42(A)(1) required the trial court to inform her, as a violent offender, of certain rights and procedures, and that the trial court erred when it failed to provide those notifications at her sentencing hearing. She urges us to vacate her registration requirement.

{¶92} The statute that Stormy cites required that the trial court inform Stormy, as a

person classified as a violent offender under R.C. 2903.41, of the rebuttable presumption that a violent offender shall be required to enroll in the violent offender database and comply with its duties for ten years after enrollment. R.C. 2903.42(A)(1)(a). The statute also required the trial court to notify her "of the offender's right to file a motion to rebut the presumption, of the procedure and criteria for rebutting the presumption, and of the effect of a rebuttal and the post-rebuttal hearing procedures and possible outcome* * *." R.C. 2903.42(A)(1). The statute further required that the trial court provide Stormy with these notifications "before sentencing." R.C. 2903.42(A)(1)(a). The record reflects that the trial court did not provide Stormy with the required notifications.[5]

**{¶93}** The state concedes that the trial court erred when it failed to provide Stormy with the notifications required by R.C. 2903.42(A)(1)(a). However, the state argues that this failure only requires the case to be remanded so that the trial court can provide the required notifications and does not require us to vacate the registration requirement.

**{¶94}** In *State v. Baker*, 12th Dist. Madison No. CA2021-03-006, 2021-Ohio-4544, we addressed the same issue. We concluded that "the trial court lacked the authority to proceed with sentencing appellant until the notifications were given," and that the sentence was thus contrary to law under R.C. 2953.08(G)(2). *Id.* at ¶ 21-22. We vacated the defendant's sentence and remanded the matter for the purposes of complying with the mandatory advisements of R.C. 2903.42(A)(1) and for resentencing. *Id.* We do the same here. *Accord State v. Walker*, 8th Dist. Cuyahoga No. 109142, 2021-Ohio-580, ¶ 61; *State v. Beard*, 8th Dist. Cuyahoga No. 109630, 2021-Ohio-2512, ¶ 62.

**{¶95}** We sustain Stormy's fourth assignment of error and remand to the trial court for purposes of complying with the mandatory advisements of R.C. 2903.42(A)(1) and for

---

5. We note that R.C. 2903.42(A)(3) imposes further notification requirements regarding Sierah's Law.

resentencing.

### D. Lifetime Post-Release Control

**{¶96}** Stormy's Assignment of Error No. 3 states:

**{¶97}** THE TRIAL COURT ERRED IN SENTENCING APPELLANT TO LIFETIME POST-RELEASE CONTROL.

**{¶98}** This assignment of error concerns the following language in the trial court's sentencing entry: "Defendant shall be subject to the supervision of the Adult Parole Authority upon her release from prison for the remainder of her life pursuant to R.C. 2967.13." Stormy argues that, by using this language, the trial court imposed "lifetime post-release control" on her, and did so in error. She contends that murder, as a special felony, is not subject to post-release control.

**{¶99}** In fact, the relevant language in the sentencing entry does not refer to "post-release control" at all. Not only did the trial court not use that phrase, but the trial court referred to "supervision" by the Adult Parole Authority "*pursuant to R.C. 2967.13.*"[6] (Emphasis added.) The statute the court referenced, R.C. 2967.13, does not concern post-release control, but rather parole eligibility. We find that, contrary to Stormy's argument, the trial court did not impose lifetime post-release control.

**{¶100}** That being said, to the extent Stormy's argument is that the trial court's statement that she "shall" be subject to "supervision" by the APA "upon her release from prison for the remainder of her life" was not authorized by statute, that argument has merit. R.C. 2967.13 provides rules regarding parole eligibility, not parole supervision after release.

---

6. The trial court used the phrase "post-release control" in the very next paragraph of the sentencing entry, when it stated that Stormy was subject to an optional period of up to three years of post-release control. This demonstrates that the court distinguished the lifetime "supervision" period addressed in the paragraph that Stormy cites in this assignment of error from the "post-release control" discussed in the next paragraph of the sentencing entry.

In *State v. Smith*, 12th Dist. Butler No. CA2020-09-101, 2021-Ohio-2982, we analyzed language much like that at issue here. In that case, the defendant was also convicted of murder and given a life sentence. In its sentencing entry, the trial court stated that the defendant's sentence "includes Mandatory Lifetime Parole supervision by the Adult Parole Authority pursuant to [R.C.] 2967.13." *Id.* at ¶ 42. We stated:

> However, [R.C. 2967.13] applies to parole eligibility, not to parole supervision after release from prison. Furthermore, no statute provides for a lifetime parole supervision in Ohio. Rather, the Adult Parole Authority may grant a paroled prisoner final release, but if the paroled prisoner has been sentenced to life in prison, "the authority shall not grant a final release earlier than five years after the paroled prisoner is released form the institution on parole." R.C. 2967.16(A).

*Id.* We found that the trial court's language regarding lifetime supervision by the APA pursuant to R.C. 2967.13 was a "clerical error[]" that "'may be corrected by the court at any time.'" *Id.* at ¶ 43, quoting Crim.R. 36. We remanded the case and instructed the trial court to "correct the improper imposition of lifetime parole supervision by the Adult Parole Authority." *Id.*

{¶101} In the sentencing entry in this case, the trial court informed Stormy that she "*shall* be subject to the supervision of the Adult Parole Authority upon her release from prison for the remainder of her life." As set forth above, this is not accurate. Stormy *could* be subject to APA supervision for the remainder of her life, but the APA *does* have the authority to grant her a final release after a minimum of five years of supervision following prison release. R.C. 2967.16(A); *State v. Rosales*, 2d Dist. Montgomery No. 27117, 2018-Ohio-197, ¶ 26 (acknowledging that R.C. 2967.16(A) means that a defendant sentenced to life in prison *may* be paroled and subject to lifetime APA supervision, but *may* also be granted final release from parole supervision, provided that final release may be granted no earlier than five years after being released from prison). Accordingly, the court was

incorrect in advising Stormy that she "shall" be subject to APA supervision for the rest of her life.

{¶102} However, we need not address in this appeal whether such an error requires a remand for resentencing. For the reasons discussed in response to Assignment of Error No. 4, we have already decided to vacate Stormy's sentence and remand for the purposes explained with regard to that assignment of error. This renders Assignment of Error No. 3 moot and it need not be considered. Yet we note that on remand the court may appropriately advise Stormy concerning APA supervision upon release.

### III. Conclusion

{¶103} For the foregoing reasons, we affirm Stormy's convictions. However, we vacate her sentence and remand to the trial court for purposes of complying with the mandatory advisements of R.C. 2903.42(A)(1) and for resentencing.

{¶104} Judgment affirmed in part and reversed in part.


M. POWELL, P.J., and S. POWELL, J., concur.